| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF MOORE | CASE NO. 20-CVS _____ |

| | |
|---|---|
| PINEHURST NEUROPSYCHOLOGY, PLLC, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| FIRST-CITIZENS BANK & TRUST COMPANY, | ) ) ) |
| Defendant. | ) ) |

**COMPLAINT**

**(Class Action)**

## NATURE OF THE ACTION

1.  Plaintiff Pinehurst Neuropsychology, PLLC ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its undersigned attorneys, brings this Class Action Complaint and jury demand against Defendant First-Citizens Bank & Trust Company ("Defendant"), for its unlawful acts and/or intentional practices of making false, misleading, and deceptive representations and omissions concerning its processing of economic assistance via the Federal Paycheck Protection Program ("PPP").

2.  Defendant made false, misleading, and deceptive material statements and omissions to consumers and small business owners who were in need of

- 1 -

financial relief and assistance as a result of the COVID-19 pandemic that it would administer, process, and grant loans in accordance with applicable Small Business Administration regulations.

3.      Specifically, Defendant knew that all loans through the PPP were vital to Plaintiff and the Class members and critically time-sensitive. Defendant, as an approved lender, agreed to comply with all applicable rules, requirements and guidelines.[1] One such requirement was that the PPP funds were to be distributed on a "*first-come, first-served*" basis.[2] Defendant, however, intentionally ignored this equitable and critical guideline. Instead, in order to protect its financial gains, Defendant prioritized the processing of larger loans over smaller loans.

4.      Defendant not only decided to line its own pockets at the expense of Plaintiff and the Class members, it affirmatively chose to not disclose to any small business owner that it was prioritizing larger business loans and favored customers, and not following the PPP's official guidelines of "first-come, first-served." Defendant's conduct was additionally harmful to Plaintiff and the Class members because, if they had known of Defendant's undisclosed prioritization of large business loans and favored customers, Plaintiff and Class members could have

---

[1]      https://www.sba.gov/sites/default/files/2020-04/PPP--Agreement-for-New-Lenders-Banks-Credit-Unions-FCS-w-seal-fillable.pdf

[2]      https://www.sba.gov/sites/default/files/2020-04/PPP--IFRN%20FINAL_0.pdf (last visited April 24, 2020)

decided to apply for PPP assistance through another financial institution and received a timely loan at the earliest possible time. Defendant's material misrepresentations and omissions ensured that there were no arms-length transactions between Defendant on the one hand, and Plaintiff and the Class Members on the other.

5. Reports of banks' inequitable review and submission process similar to those employed by Defendant prompted Senator Marco Rubio, Chairman of the Committee of Small Business & Entrepreneurship, to address a formal letter to several large banks explaining "it is important for small businesses and nonprofits of various sizes, regional locations, and missions to have equal access to PPP assistance."[3] This letter was prompted by "reports of priority being given to certain applicants over others" and was concluded by a series of questions designed to "ensure a neutral distribution of assistance."[4]

6. Defendant's actions and practices were unfair, immoral, unethical, unscrupulous, and substantially injurious to Plaintiff and Class members.

7. Defendant's misrepresentations, omissions, unfair actions, and wrongdoing caused substantial injury to small businesses such as Plaintiff and the Class members who were thus unable to benefit from the economic assistance in a timely and fair manner.

---

[3] Senator Rubio's letter is attached as Exhibit A.
[4] *Id.*

## JURISDICTION AND VENUE

8.  The foregoing allegations are incorporated by reference and realleged herein.

9.  This Court has jurisdiction over the parties and this action pursuant to N.C.G.S. § 75-16 and N.C.G.S. § 1-75.4.

10. Venue is proper under N.C.G.S. §§ 1-79 and 1-82 in that Plaintiff maintains a business in Moore County, Defendant regularly conducts business in Moore County, and the facts that give rise to the allegations in this Complaint occurred in Moore County.

## PARTIES

11. Plaintiff is, and at all times relevant hereto has been, a professional limited liability company with its principal place of business in North Carolina. Founded in 2013, Plaintiff is a brain and memory clinic that helps patients find the most likely causes of cognitive or behavior change, with a focus on dementia. Plaintiff is a bank customer of Defendant for approximately seven years.

12. Plaintiff, like other reasonable small business owners, saw and reasonably relied upon Defendant's false, misleading, and deceptive misrepresentations and omissions alleged herein, when making its decision to apply for loan assistance through the PPP. Plaintiff, like other small business owners, had a reasonable expectation that Defendant would process its application

- 4 -

on a first-come, first-served basis without regard to the size of the loan or identity of the applicant.

13.     Plaintiff was unaware of Defendant's misleading and deceptive misrepresentations and omissions, or its unfair practices, regarding its administration and handling of the loan assistance through the PPP at the time Plaintiff submitted an application through Defendant.

14.     Defendant First-Citizens Bank & Trust Company is headquartered in Raleigh, North Carolina.

## FACTUAL ALLEGATIONS

15.     As a result of the rapidly increasing number of cases and countries affected by COVID-19, on March 11, 2020, the World Health Organization's ("WHO") Director-General declared COVID-19 as to be a pandemic.

16.     In response to the rapid spread of COVID-19 throughout North Carolina, on March 27, 2020, North Carolina's Governor Roy Cooper issued Executive Order 121 ("Order"), which ordered North Carolina residents to stay at home.

17.     The Order allowed certain "essential services" to remain open, including healthcare operations, banks, gas stations, pharmacies, grocery stores, and state and local government functions. However, even entities identified as

- 5 -

essential have experienced dramatic and significant decreases in their operations related to COVID-19.

18. On March 27, 2020, President Trump signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act into law, including the provision of $376 billion in economic assistance to small businesses.

19. The CARES Act was intended to provide direct economic assistance to workers and small businesses, and to preserve U.S. jobs.

20. The CARES Act created certain economic programs designed to provide financial assistance to small business owners, including the PPP.

21. The PPP was designed to help small businesses, like Plaintiff, cover the costs associated with retaining their employees during the COVID-19 pandemic by providing 100% federally guaranteed loans. Additionally, the loans may be forgiven, they carry no Small Business Administration ("SBA") fees, and loan repayment can be deferred for six months.

22. Moreover, all SBA lenders, including Defendant, "must act ethically" and may not, among other things, (i) self-deal; (ii) have a real or apparent conflict of interest with a borrower; (iii) knowingly misrepresent or make a false statement to the SBA; (iv) engage in conduct reflecting a lack of business integrity or honesty; or (v) engage in any activity which taints the bank's objective judgment in

- 6 -

evaluating the loan. *See* 13 CFR Part 120.140. Defendant breached these duties, as well as North Carolina law, and their fiduciary obligations.

23.     Small businesses are eligible to apply for a loan through the PPP if they have been harmed by the COVID-19 pandemic between February 15, 2020 and June 30, 2020.  Loans are retroactive to February 15, 2020, in order to provide assistance to workers who were already laid off.

24.     While the loans were guaranteed by the federal government, small business owners need to apply for such loans through banks like Defendant.

25.     According to the U.S. Small Business Administration's ("SBA") Office of Advocacy, in 2018, the country had 30.2 million small businesses, representing 99.9% of all U.S. businesses and 47.5% of all employees in the U.S.[5]

26.     Of the 30.2 million small businesses in the U.S., 22 million are individually operated, with no employees other than the owner.[6]

27.     In 2018, the average loan amount backed by the SBA was $107,000.[7]

28.     Beginning on April 3, 2020, small businesses and sole proprietorships could apply for and receive loans through the PPP.  Beginning on April 10, 2020,

---

[5]     https://www.sba.gov/sites/default/files/advocacy/2018-Small-Business-Profiles-US.pdf (last accessed April 21, 2020)

[6]     https://www.chamberofcommerce.org/small-business-statistics/ (last accessed April 21, 2020)

[7]     https://www.valuepenguin.com/average-small-business-loan-amount (last accessed April 21, 2020)

Case 1:20-cv-00636-LCB-LPA   Document 4   Filed 07/10/20   Page 7 of 27

independent contractors and self-employed individuals could apply for and receive such loans. The last day to apply for and receive a loan through the PPP is June 30, 2020.

29.    Loans and applications for the same through the PPP were time-sensitive as they were to be administered on a "first-come, first-served" basis. Consequently, loans should have been considered by banks in the order in which they were received, rendering the loan amount or the intended recipient of the loan insignificant.[8]

30.    Lenders of PPP loans earned varying percentages of origination fees, based on the loan amount: five percent on loans not more than $350,000; three percent on loans more than $350,000 but less than $2,000,000; and one percent on loans more than $2,000,000.[9]

31.    Because of the tiered percentage-based origination fees, lenders were financially incentivized to move larger loan applications to the front of the que and approve larger loans ahead of smaller ones: one percent fees on a $5,000,000 loan

---

[8] SMALL BUSINESS ADMINISTRATION Interim Final Rule §m [Docket No. SBA-2020-0015] 13 CFR Part 120 Business Loan Program Temporary Changes; Paycheck Protection Program RIN 3245-AH34.
[9]
https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf (last accessed April 22, 2020)

would earn a bank $50,000 while five percent on a $350,000 loan would earn $17,500.

32. The SBA tracked the numbers of approved loans and dollars for both the first 10 days of the PPP (April 3-13, first chart) and through the last 3 days (through April 16, second chart).[10]

| Loan Size | Approved Loans | Approved Dollars | % of Count | % of Amount |
|---|---|---|---|---|
| $150K and Under | 725,058 | $37,178,984,187 | 70.05% | 15.02% |
| >$150K - $350K | 156,590 | $35,735,615,983 | 15.13% | 14.44% |
| >$350K - $1M | 102,473 | $59,291,602,643 | 9.90% | 23.95% |
| >$1M - $2M | 31,176 | $43,278,883,532 | 3.01% | 17.48% |
| >$2M - $5M | 16,516 | $49,288,997,593 | 1.60% | 19.91% |
| >$5M | 3,273 | $22,769,309,582 | 0.32% | 9.20% |

- Overall average loan size is $239,152.

| Loan Size | Approved Loans | Approved Dollars | % of Count | % of Amount |
|---|---|---|---|---|
| $150K and Under | 1,229,893 | $58,321,791.761 | 74.03% | 17.04% |
| >$150K - $350K | 224,061 | $50,926,354,675 | 13.49% | 14.88% |
| >$350K - $1M | 140,197 | $80,628,410,796 | 8.44% | 23.56% |
| >$1M - $2M | 41,238 | $57,187,983,464 | 2.48% | 16.71% |
| >$2M - $5M | 21,566 | $64,315,474,825 | 1.30% | 18.79% |
| >$5M | 4,412 | $30,897,983,582 | 0.27% | 9.03% |

- Overall average loan size is $206K.

---

[10] https://www.sba.gov/sites/default/files/2020-04/PPP%20Report%20SBA%204.14.20%20%20-%20%20Read-Only.pdf and https://www.sba.gov/sites/default/files/2020-04/PPP%20Deck%20copy.pdf (last accessed April 22, 2020)

- 9 -

33. Not only was the overall average loan size greater during the first ten days (see charts above: $239,152 vs. $206,000), but the number of approved loans for applications under $350,000 was significantly greater in the last three days before PPP funds ran out when compared to the first ten days: 881,648 approved loans in the first ten days versus 1,453,954 approved loans as of the last day PPP funds were available. In the period between April 14 through April 16, 572,306 loans were approved, representing a 65% increase.

34. That 65% increase is even more telling when compared with the difference in approved loans for applications above $2,000,000 for the same period. In the first ten days, 19,789 loans were approved versus 25,978 loans approved as of the last day PPP funds were available, meaning that between April 14-16, 6,189 loans were approved, equaling a 31% increase.

35. With such varying data, it is clear that lenders such as Defendant did not process loans on a "first-come, first-served" basis as required by the PPP, but that the loan amount influenced when it was processed and approved.

36. In addition, lenders such as Defendant regularly chose to provide tailored concierge service to favored customers regardless of whether of other customers applied first or had even applied at all.

37. For example, Defendant failed to provide the same knowledge, technological support, and resources for its retail branches to process applications

- 10 -

made by small businesses that it did for its larger customers and/or its favored customers. This led to Defendant's larger and more prominent customers receiving loan assistance through the PPP via a prioritized application review and submission while large percentages of its retail branch customers' applications were de-prioritized without regard to when the applications were filed.

38.     Plaintiff learned of the CARES Act and PPP when it was passed and signed into law by President Trump.

39.     Plaintiff's business activities have been substantially harmed by the world-wide pandemic.

40.     On March 30, 2020, one of Defendant's employees sent an e-mail communication to Plaintiff with initial application materials but emphasized that the application materials could change. One day later, on March 31, 2020, one of Defendant's employees sent an e-mail communication to Plaintiff with another sample application but stated "this is unverified and may not be the final application, so please don't complete it and send it back to me."

41.     On April 1, 2020, one of Defendant's employees sent an e-mail communication encouraging customers, including Plaintiff, to work on the application materials because "[t]he early bird gets the worm." One day later, the same employee sent a follow-up e-mail explaining there would be more delays before the loan applications would be submitted or accepted.

- 11 -

42.    On April 5, 2020, Defendant submitted the applicable package to its customers, including Plaintiff, at or around 8:00 a.m. Plaintiff immediately began its application and submitted it the same day, at or around 3:00 p.m.

43.    On April 6, 2020, Defendant explained that Plaintiff's application "is in line."

44.    Upon a request for an update from Plaintiff, on April 9, 2020, one of Defendant's employees sent an e-mail communication asking Plaintiff to re-submit a modified application. Separately, Defendant encouraged Plaintiff to seek out a PPP loan through online entities.

45.    On April 13, 2020, Defendant requested Plaintiff again modify its application and re-submit certain application material.

46.    On information and belief, on or about April 16, 2020, Defendant began telling other PPP loan applicants that its allotment of the PPP loan money approved by Congress was already allocated. Despite submitting its application on the same day that the application was available, Plaintiff did not receive a PPP loan.

47.    Because Plaintiff submitted an application for a loan through the PPP with Defendant, it was denied access to funds that would have helped it mitigate the issues resulting from its business closure and the economic crisis, and was

delayed from seeking assistance from a different lender. Plaintiff suffered financial harm in the delay in accessing a PPP loan.

48.     Defendant misled and deceived its customers, including Plaintiff, into believing applications for loans through the PPP were processed in the order received with no regard to loan amount and in terms of first-come-first-served, when in fact the loan amount and the identity of the recipient influenced the order in which loan was processed and approved.

49.     If Defendant had not misled and deceived its small business customers, such clients could have submitted their applications for loans through the PPP with other lenders that were following the required "first-come, first-served" application processing order.

50.     Defendant knew its clients trusted them and believed they would administer the PPP as required, but chose to exploit its clients' trust. As a result of Defendant's greed and focus on its own financial incentives, countless small businesses were prevented from benefiting from the program, or delayed from benefiting from the program, designed to help them – not the Defendant – survive during the COVID-19 pandemic.

- 13 -

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action individually and on behalf of the following

Class pursuant to Rule 23:

> All eligible persons or entities in the State of North Carolina
> who applied for a loan under the PPP with Defendant and
> whose applications were not processed by Defendant in
> accordance with SBA regulations and requirements or North
> Carolina law.

52.     Excluded from the proposed class are Defendant, any parent

companies, subsidiaries, and/or affiliates, officers, directors, legal representatives,

employees, co-conspirators, all governmental entities, and any judge, justice, or

judicial officer presiding over this matter.

53.     This action is brought and may be properly maintained as a class

action.  There is a well-defined community of interests in this litigation and the

members of the Class are easily ascertainable.

54.     The members in the proposed class are so numerous that individual

joinder of all members is impracticable, and the disposition of the claims of the

Class members in a single action will provide substantial benefits to the parties and

Court.

55.     Questions of law and fact common to Plaintiff and the Class include,

but are not limited to, the following:

> (a) Whether Defendant violated the regulations for administering,
> processing, and handling loans through the PPP;

- 14 -

(b) Whether Defendant made false, misleading, and deceptive misrepresentations and omissions regarding its administration, processing, and handling of the applications for loans from small businesses through the PPP;

(c) Whether Defendant failed to administer, process, and handle loans on a "first-come, first-served" basis as required by the PPP;

(d) Whether Defendant administered, processed, and handled larger loans before smaller loans;

(e) Whether Defendant violated applicable North Carolina laws;

(f) Whether Defendant engaged in false advertising;

(g) Whether Defendant fraudulently concealed material facts from its customers;

(h) Whether Defendant's practices were unfair, immoral, unethical, unscrupulous, or substantially injurious;

(i) Whether Defendant's conduct was negligence per se;

(j) Whether Defendant breached a fiduciary duty;

(k) Whether Plaintiff and members of the Class are entitled to statutory and punitive damages; and

(l) Whether Plaintiff and the members of the Class are entitled to declaratory and injunctive relief.

56. Defendant engaged in a course of common conduct that gave rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Class. Identical statutory violations and business practices

and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

57.     Plaintiff's claims are typical of those of the members of the Class because they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

58.     Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

59.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Class is small such that, absent representative litigation, it would be infeasible for members of the Class to redress the wrongs done to them.

60.     Questions of law and fact common to the Class predominate over any questions affecting only individual members of a Class.

61.     As a result of the foregoing, class treatment is appropriate.

## CLAIMS FOR RELIEF

## COUNT I
### Violation of North Carolina's Unfair and Deceptive Trade Practices Act
[N.C. Gen. Stat. § 75.1-1, *et seq.*] Against Defendant on Behalf of the Class

62.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

63.     N.C. Gen. Stat. § 75-1.1 makes unlawful, "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

64.     As set forth herein Defendant's misrepresentations and omissions that it was working to process loan applications through the PPP in order to provide assistance to its customers were literally false, misleading, and likely to deceive the public.

65.     Defendant's conduct with respect to the administration, processing, and handling of the applications from small businesses for loans through the PPP was unfair, immoral, unethical, unscrupulous, or substantially injurious to its clients. The utility of its conduct, if any, does not outweigh the gravity of harm to its victims.

66.     Defendant's conduct with respect to the administration, processing, and handling of the applications from small businesses for loans through the PPP was also unfair because in order to maximize its financial gain associated with

- 17 -

loans through the PPP, it prioritized larger loans over smaller ones while deceiving and misleading small business owners into believing their loans were processed on a "first-come, first-served" basis, as dictated by the PPP.

67.    Defendant's misrepresentations, omissions, and other deceptive and unfair conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiff and other Class members to be deceived about the likelihood of obtaining a loan through the PPP as described herein.

68.    As a direct and proximate cause of these unfair, deceptive, and unconscionable commercial practices, Plaintiff and the Class members have been damaged and are entitled pursuant to N.C. Gen. Stat. § 75-16 to recover treble damages as well as attorneys' fees and costs.

## COUNT II
**Fraudulent Concealment Against Defendant on Behalf of the Class**

69.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

70.    Defendant fraudulently concealed material facts it had a legal duty to disclose to Plaintiff and the Class members regarding its administration, processing, and handling of the loans through the PPP. These material facts known by Defendant were:

> (a) The order of how applications for loans through the PPP would actually be processed and granted;

- 18 -

(b) That the processing and granting of larger loans would be given priority over smaller loans; and

(c) The applications for loans through the PPP would not be processed or granted in accordance with the PPP.

71. Defendant intentionally and knowingly omitted this information to induce Plaintiff and the Class members to submit applications for loans through the PPP with them.

72. Defendant knew the concealment or nondisclosure of these facts regarding the true nature of how the PPP loan applications were going to be administered, processed, and handled were material to its clients because they contradicted the representations made by Defendant in its statements and marketing.

73. Defendant had a legal duty to disclose this information because Defendant knew the representations made in its statements and marketing created a false impression unless these omitted material facts were disclosed to Plaintiff and the Class members.

74. Plaintiff and the Class members had no knowledge of the true nature of how the PPP loan applications were going to be administered, processed, and handled based on Defendant's fraudulent concealment and nondisclosures, and they had no ability to discover the omitted information prior to submitting their loan applications. Given the deceptive manner in which Defendant chose to omit

- 19 -

or not disclose material information concerning the true nature of how it was administering, processing, and handling PPP loan applications, Plaintiff and the Class members were injured.

75.     As a direct and proximate result of Defendant's conduct, Plaintiff and the Class members suffered actual damages in that they submitted applications for loans through the PPP with Defendant and were prevented or delayed from seeking assistance from another lender.

76.     Plaintiff and the Class members seek injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the law.

## COUNT III

### Breach of Fiduciary Duty Against Defendant on Behalf of the Class

77.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

78.     Defendant owed and owes Plaintiff and the Class members fiduciary obligations. By reason of its fiduciary relationships, the Defendant owed and owes Plaintiff and the Class members the highest obligation of good faith, fair dealing, loyalty, and due care.

79.     Defendant violated and breached its fiduciary duties to Plaintiff and the Class members.

- 20 -

80.     Defendant made false, misleading, and deceptive misrepresentations and omissions regarding its administration, processing, and handling of the applications for loans from small businesses through the PPP.

81.     Additionally, Defendant unjustly profited from the administration, processing, and handling of loans through the PPP as it received origination fees based on the loan amounts and maintained positive relationships with favored customers.

82.     As a direct and proximate result of the Defendant's breaches of its fiduciary obligations, Plaintiff and the Class members have sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, Defendant is liable to Plaintiff and the Class members.

83.     Plaintiff and the Class members seek declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the law.

## COUNT IV
### Negligence Against Defendant on Behalf of the Class

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     Defendant's conduct is negligence per se.

86.     As set forth above and below, Defendant violated its statutory duties under numerous statutes, including the North Carolina Unfair and Deceptive Trade Practices Act.

- 21 -

87. Additionally, Defendant must comply with SBA regulations such as 13 CFR Part 120.140, which states that lenders "must act ethically and exhibit good character" that prohibits "engag[ing] in conduct reflecting a lack of business integrity or honesty." 13 CFR Part 120.140(f); *see also* 13 CFR Part 120.140(b), (j)(1), (l).

88. Defendant's violations of such statutes is negligence per se and was a substantial factor in the harm suffered by Plaintiff and the Class members, including their submission of applications for loans through the PPP with Defendant who violated the "first-come, first-served" basis for processing loan applications, as dictated by the PPP, when it processed larger loans ahead of smaller loans and/or favored customers over other customers.

89. As set forth above, such laws were intended to ensure that a company's claims about its services are truthful and accurate and that they engaged in business in an ethically and honest manner.

90. By virtue of Defendant's negligence, Plaintiff and the Class members have been damaged in an amount to be proven at trial or, alternatively, seek rescission and disgorgement under this Count.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.  ·

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff, individually and on behalf of all others similarly situated, respectively requests relief against Defendant as set forth below:

A.    Certifying the proposed Class; appointing Plaintiff as Class representative, and its undersigned counsel as Class counsel;

B.    An order requiring Defendant to bear the costs of class notice;

C.    An order enjoining Defendant from administering, processing, or handling loans through the PPP inconsistent with or in violation of the PPP;

D.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as alleged herein, and injunctive relief to remedy Defendant's past conduct;

E.    An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

F.    An order requiring Defendant to pay punitive damages on any count so allowable;

G.    An order requiring Defendant to pay all statutory damages permitted under the counts alleged herein;

- 23 -

H.  An order awarding attorneys' fees and costs, including the costs of pre-suit investigation, to Plaintiff and the Class members; and

I.  An order providing for all other such equitable relief as may be just and proper.

Dated: May 27, 2020

**WHITFIELD BRYSON LLP**

Daniel K. Bryson
N.C. Bar. No. 15781
Scott C. Harris
N.C. Bar No. 35328
Martha A. Geer
N.C. State Bar No. 13972
Patrick M. Wallace
N.C. Bar No. 48138
900 West Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
E-mail: dan@whitfieldbryson.com
          scott@whitfieldbryson.com
          martha@whitfieldbryson.com
          pat@whitfieldbryson.com


Robert K. Shelquist *
Rebecca A. Peterson*
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rkshelquist@locklaw.com
          rapeterson@locklaw.com

- 24 -

Benjamin Galdston*
BERGER MONTAGUE PC
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Telephone: (619) 489-0300
E-mail: bgaldston@bm.net

Gregory F. Coleman*
GREG COLEMAN LAW PC
First Tennessee Plaza
800 South Gay Street, Suite 100
Knoxville, TN 37929
Telephone: (865) 247-0080
E-mail: greg@gregcolemanlaw.com

Alex R. Straus*
GREG COLEMAN LAW PC
16748 McCormick Street
Los Angeles, CA 91436
Telephone: (310) 450-9689
E-mail: alex@gregcolemanlaw.com

*Attorneys for Plaintiff*

* *Pro hac vice* pending

- 25 -

MARCO RUBIO, FLORIDA, CHAIRMAN
BENJAMIN L. CARDIN, MARYLAND, RANKING MEMBER

JAMES E. RISCH, IDAHO
RAND PAUL, KENTUCKY
TIM SCOTT, SOUTH CAROLINA
JONI ERNST, IOWA
JAMES M. INHOFE, OKLAHOMA
TODD YOUNG, INDIANA
JOHN KENNEDY, LOUISIANA
MITT ROMNEY, UTAH
JOSH HAWLEY, MISSOURI

MARIA CANTWELL, WASHINGTON
JEANNE SHAHEEN, NEW HAMPSHIRE
EDWARD J. MARKEY, MASSACHUSETTS
CORY A. BOOKER, NEW JERSEY
CHRISTOPHER A. COONS, DELAWARE
MAZIE HIRONO, HAWAII
TAMMY DUCKWORTH, ILLINOIS
JACKY ROSEN, NEVADA

WILLIAM HENDERSON, REPUBLICAN STAFF DIRECTOR
SEAN MOORE, DEMOCRATIC STAFF DIRECTOR

**United States Senate**
COMMITTEE ON SMALL BUSINESS & ENTREPRENEURSHIP
WASHINGTON, DC 20510-6350
TELEPHONE: (202) 224-5175   FAX: (202) 224-5619

April 22, 2020

Brian Moynihan
Chairman of the Board and Chief Executive Officer
Bank of America Corporation
100 North Tryon Street
Charlotte, North Carolina 28255

Dear Mr. Moynihan:

America's nearly 30 million small businesses face an unprecedented challenge in surviving the economic contraction caused by public health restrictions related to the novel coronavirus. Many small business owners face losing their life's work and the prospects of laying off employees they know and care for. In response to this challenge, on March 27, 2020 President Trump signed into law the *Coronavirus Aid, Relief, and Economic Security (CARES) Act* (P.L. 116-136). This law enacted the Paycheck Protection Program (PPP), a historic and bipartisan expansion of financial relief for small businesses.

In the *CARES Act*, Congress authorized and funded $349 billion in PPP loans, which are forgivable loans made to small businesses and nonprofits to cover payroll costs and fixed debt obligations for an eight-week period. These loans, which are made through the U.S. Small Business Administration (SBA)'s flagship 7(a) Loan Guaranty Program, serve entrepreneurs and business owners ranging from the self-employed and independent contractors, to small and medium sized businesses with up to 500 employees. They are available to borrowers nationwide, regardless of location in an urban or rural area.

Thanks to the hard work of the Department of Treasury, the SBA, and thousands of lenders who have worked around the clock, the Administration has thus far approved over 1.6 million PPP loans for a sum of nearly $350 billion. The largest category of loan size is under $350,000, and it is estimated that these loans have saved over 30 million jobs from impending layoffs.

Banks like yours fulfill an important duty of public service through their participation in PPP. Small businesses are the backbone of America and they contribute to the public far more than economic output. Small businesses are also community institutions that provide essential services and employment. During this time of great need, Americans need small businesses to be the source of stability they are used to them being.

Banks' duties to provide assistance during this time correspond to the public necessity of a strong small business sector. Banks are publicly chartered institutions that receive the license of the state to create credit. The PPP provides terms for banks to create credit that sustains small



businesses during this time of uncertainty. Moreover, there is ample private benefit at stake for banks. The largest processing fees banks earn on PPP loans are for loans of less than $350,000. Preserving small businesses during this crisis by helping them retain their employees and pay their bills will help to ensure a strong economic recovery, and more small business clients in the future.

However, since the program began accepting applications and issuing approvals on Friday, April 3, 2020, I, as well as other members of the Senate, have received reports of priority being given to certain applicants over others. While I recognize the challenges of setting up a program of this size, processes to handle applications, and appropriate guidance to administer the program, it is important for small businesses and nonprofits of various sizes, regional locations, and missions to have equal access to PPP assistance. To ensure a neutral distribution of assistance, I request that you provide the Committee with answers to the following questions:

1. Did your financial institution set up an application process for PPP that is based on a first-come, first-serve basis from within the pool of eligible applicants? If not, please describe why not.

2. Did your financial institution include any filters in its application process that would prioritize certain borrowers over others? If so, please describe the factors for which those filters select.

3. What practices and processes does your financial institution have in place to ensure neutral access to PPP loans for small business borrowers across relevant size, regional, and ownership categories?

I remain committed to working with you to serve small businesses across the country who are shuttered, and devastated, by the public closures as a result of the novel coronavirus. Please provide answers to the Committee by May 1, 2020. I appreciate your attention to this important matter.

Sincerely,

Marco Rubio
Chairman